## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | |
|---|---|
| ANDREW EPSTEIN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENERGY TRANSFER PARTNERS, L.P., ENERGY TRANSFER PARTNERS G.P., L.P., ENERGY TRANSFER PARTNERS, L.L.C., ENERGY TRANSFER EQUITY, L.P., KELCY L. WARREN, MATTHEW S. RAMSEY, JAMES R. PERRY, MARSHALL S. MCCREA, III, TED COLLINS, JR., MICHAEL K. GRIMM, and DAVID K. SKIDMORE,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Andrew Epstein ("Plaintiff"), by and through his undersigned counsel, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1.     Plaintiff brings this action on behalf of himself and the other public unitholders of partnership units of Energy Transfer Partners, L.P. ("ETP" or the "Partnership") against the Partnership and its Board of Directors (the "Board" or "Director Defendants"), ETP's general partner Energy Transfer Partners GP, L.P. ("ETP GP"), ETP GP's general partner Energy Transfer Partners, L.L.C. ("ETP LLC"), for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules and Regulations promulgated thereunder, including Rule 14a-9, in connection with the proposed merger of ETP with Sunoco Logistics Partners L.P. ("SXL") pursuant to the November 20, 2016 Agreement and Plan of Merger (the "Merger Agreement"), through SXL's newly formed wholly-owned Delaware

company, SXL Acquisition Sub LLC ("Merger Sub").  Under the Merger Agreement's terms, Merger Sub will merge with and into ETP, with ETP surviving as a wholly owned subsidiary of SXL.  The Merger Agreement was amended on December 16, 2016, so that Sunoco GP, general partner of SXL ("SXL GP"), will merge with Energy Transfer Partners GP, L.P., the general partner of ETP ("ETP GP"), with ETP GP continuing as the surviving entity and becoming the general partner of SXL GP ("Proposed Transaction").[1]

2.      Pursuant to the terms of the Merger Agreement, holders of ETP common units will receive 1.5 SXL common units for each common unit held, and holders of ETP Series A Cumulative Convertible Preferred Units (the "Series A units") will receive an equal number of SXL preferred units, with the same rights and privileges that such Series A units had immediately prior to the closing of the Proposed Transaction.

3.      Additionally, the Class E units, Class G units, Class I units, Class J units and Class K units of ETP issued and outstanding immediately prior to the effective time will be cancelled and converted automatically into an equal number of newly created classes of units representing limited partner interests in SXL, with the same rights and privileges as such classes of ETP units had immediately prior to the closing of the Proposed Transaction.  Under the terms of the merger agreement, ETP's Class H units and incentive distribution rights will be cancelled for no consideration.

4.      Based on the closing price of ETP's common unit on November 18, 2016, the last trading day before the Merger Agreement was announced, this implies a per unit consideration of approximately $39.29 (the "Merger Consideration").  This Merger Consideration is inadequate and undervalues the Partnership.  After years of industry-wide drop in energy prices, the

---

[1]      Energy Transfer Equity, L.P ("ETE") serves as the indirect parent entity of all ETP, ETP GP, SXL and SXL GP.

Partnership has consistently improved its operations and earning as reflected in the Partnership's unit performance.  The Merger Consideration does not value this rebound, which is perhaps best illustrated by the paltry control premium of approximately 5% to the volume-weighted average closing price of ETP common units for the five trading days ended November 18, 2016 percent represented by the implied Merger Consideration.  One week prior to the announcement of the Merger Agreement, a Credit Suisse analyst set a price target for ETP units at $50.00 per unit. Indeed, the market reacted negatively to the announcement with ETP's unit declining steadily from $39.29 on November 18, 2016 to around $35.76 on January 20, 2017.

5. The Proposed Transaction was marred by a flawed process driven by certain conflicted members of ETP Board, who will receive windfall profits from equity compensation packages and cash outs.  In addition, certain members of the Board and management secured for themselves lucrative continuing employment with the surviving company.

6. Indeed, the effort to transfer ETP to SXL took about one month and involved no attempt to engage in a market check, or even reach out to any other entity, to determine if a better offer could be obtained.  SXL and ETP jointly own the Dakota Access Pipeline.[2]  The Proposed Transaction represents a monopolistic consolidation in a field with few competitors.[3] Indeed, the Proposed Transaction is an inside job, enabled by the indirect parent of ETP, SXL and other related entities.

7. In order to solicit ETP's unitholders to vote in favor of this flawed transaction, the

---

[2] As of December 4, 2016, ETP owned the general partner, 100% of the incentive distribution rights, and approximately 67.1 million common units in SXL. www.businesswire.com/news/home/20161204005090/en/Energy-Transfer-Partners-Sunoco-Logistics-Partners-Respond.

[3] According an investor presentation dated November 2016, the Proposed Transaction will result in country's the second largest master limited partnership (https://www.sec.gov/Archives/edgar/data/1012569/000101256916000233/sxlandetpinvestorpresent.htm).

Board authorized the filing of a materially false and/or misleading Form S-4 Registration Statement with the Securities and Exchange Commission ("SEC") on December 19, 2016 (the "S-4") (which contains a preliminary proxy statement for ETP unitholders).   The S-4 recommends and solicits ETP unitholders to vote in favor of the Proposed Transaction and exchange their units pursuant to the terms of the Merger Agreement, based among other things on misleading internal ETP and SXL financial projections and relied on by the Board and incorporated into the opinion of the ETP conflict committee's financial advisor, Barclays Capital Inc. ("Barclays") (itself with potential conflicts of interest), that was rendered to the Board in a fairness opinion ("Fairness Opinion").   Thus, the S-4 is false and/or misleading due to the omission of material information concerning the following: (i) the process leading to the execution of the Merger Agreement; (ii) the projections for ETP and SXL and relied on by the Board and used by Barclays, in support of its Fairness Opinion; and (iii) the financial analysis performed by Barclays.

8.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against ETP and the Board for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78n(a), 78t(a), and SEC Rules G and 14a-9).   Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to ETP unitholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Section 14(a) of

the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.  17 C.F.R. § 240.14a-9.

10.     This Court has personal jurisdiction over each Defendant either because the Defendant is an individual who is present in this District or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) ETP is a limited partnership headquartered and/or formed in this District.

## PARTIES

12.     Plaintiff has, and continues to be, at all relevant times a unitholder of ETP.

13.     ETP is a limited partnership organized and existing under the laws of the State of Delaware with its principal executive offices located at 8111 Westchester Drive, Suite 600 Dallas, Texas 75225.   The Partnership transmits, stores, distributes, gathers, and processes natural gas and trades on the NYSE under the symbol "ETP".   ETP is described on its website as follows:

> Energy Transfer Partners, L.P. (NYSE:ETP) is a master limited partnership that owns and operates one of the largest and most diversified portfolios of energy assets in the United States. ETP's subsidiaries include Panhandle Eastern Pipe Line Company, LP (the successor of Southern Union Company) and Lone Star NGL LLC, which owns and operates natural gas liquids storage, fractionation and transportation assets. In total, ETP currently owns and operates approximately 62,500 miles of natural gas and natural gas liquids pipelines. ETP also owns the general partner, 100% of the incentive distribution rights, and 67.1 million common units of SXL Logistics Partners L.P. (NYSE:SXL), which operates a geographically diverse portfolio of complementary crude oil, refined products, and natural gas liquids pipeline, terminalling acquisition and marketing assets which are used to facilitate the purchase and sale of crude oil, natural gas liquids, and refined products. ETP's general partner is owned by Energy Transfer Equity, L.P. (NYSE:ETE).

14.     ETP GP, L.P. is a Delaware limited partnership and the general partner of ETP.

15.     ETP LLC is the general partner of ETP GP.

16.     ETE is a Delaware limited partnership and indirect parent of ETP, ETP GP, Sunoco and Sunoco Partners, LLC. ETE is headquartered in Dallas, Texas and trades on the New York Stock Exchange under the symbol "ETE."

17.     Defendant Kelcy L. Warren ("Warren") has served as Chairman of the Board and Chief Executive Officer ("CEO") since 2007.  Warren also serves on ETE's board of directors.

18.     Defendant Matthew S. Ramsey ("Ramsey") has served as a director of the Partnership since 2009.  Ramsey also serves on Sunoco, LP's and ETE's board of directors.

19.     Defendant James R. Perry has served as a director of the Partnership since 2015. Perry resigned from the Board on December 31, 2016.  Perry also serves on SXL's board of directors.

20.     Defendant Marshall S. McCrea, III ("McCrea") has served as a director of the Partnership since 2009 and has held various officer positions with several of the Energy Transfer entities.  McCrea also serves on ETE's, SXL's and Sunoco, L.P.'s boards.

21.     Defendant Ted Collins, Jr. ("Collins") has served as a director of the Partnership since 2004.

22.     Defendant Michael K. Grimm ("Grimm") has served as a director of the Partnership since 2005.

23.     Defendant David K. Skidmore ("Skidmore") has served as a director of the Partnership since 2013.

24.     Defendants Warren, Ramsey, Perry, McCrea, Collins, Grimm, and Skidmore are collectively referred to as the "Board" or the "Individual Defendants."  The Board and ETP may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or

director of the Partnership, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public unitholders of ETP (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

26.     This action is properly maintainable as a class action.

27.     The Class is so numerous that joinder of all members is impracticable.  As of November 18, 2016, there were approximately 544,565,775 outstanding units of ETP common unit.  All members of the Class may be identified from records maintained by ETP or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

28.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act and SEC Rules and Regulations including Rule 14a-9; (ii) whether the Director Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their units regarding the Proposed Transaction based on the false and/or misleading S-4.

29.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, Plaintiff has the same interests as the other members of the Class, and Plaintiff does not have any interests that are adverse to the Class.  Accordingly, Plaintiff is

an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

30.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

31.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

32.     ETP is a natural gas infrastructure partnership that owns and operates a portfolio of natural gas-related energy assets in North America.  The Partnership is managed by ETP GP.  The Partnership manages fuel and convenience store brands through its retail portfolio of outlets, including SXL and Aplus.  In addition to its operating brands, its subsidiaries operate as a distributor to multiple fuel brands, including Exxon, Mobil, Valero, Shell and Chevron.[4]

33.     The Partnership operates through seven business segments including: (1) Intrastate Transportation and Storage Segment (through Le Grange Acquisition L.P.); (2) Interstate Transportation and Storage Segment (through Energy Transfer Interstate Holdings,

---

[4]     http://www.reuters.com/finance/stocks/companyProfile?symbol=ETP.

LLC); (3) Midstream Segment; (4) Liquids Transportation and Services Segment; (5) Investment in SXL Logistics Segment; (6) Retail Marketing Segment, and (7) All Other Segment.[5]

34.     Through La Grange Acquisition, L.P. ("ETC OLP"), the Partnership's intrastate transportation and storage segment owns and operates approximately 7,500 miles of natural gas transportation pipelines with over 14.1 billion cubic feet per day (Bcf/d) of transportation capacity and approximately three natural gas storage facilities located in the state of Texas. Natural gas transportation pipelines receive natural gas from other mainline transportation pipelines and gathering systems and deliver the natural gas to industrial end-users, utilities and other pipelines.  The segment focuses on the transportation of natural gas to markets from various prolific natural gas producing areas through connections with other pipeline systems.

35.     Similar to its ETC OLP segment, through Energy Transfer Interstate Holdings, LLC, the Partnership's interstate transportation and storage segment directly owns and operates approximately 12,300 miles of interstate natural gas pipeline with over 11.2 Bcf/d of transportation capacity.  The segment's pipeline network, including, amongst others, the Panhandle, Trunkline and Sea Robin transmission systems, serves customers in the Midwest, Gulf Coast and Midcontinent United States with an array of transportation and storage services.

36.     The Midstream segment owns and operates approximately 35,000 miles of in service natural gas, over 30 natural gas processing plants, approximately 20 natural gas treating facilities and over four natural gas conditioning facilities with an aggregate processing, treating and conditioning capacity of approximately 10.1 Bcf/d.  The operations focus upon gathering, compression, treating, blending and processing, with a concentration in various producing basins and shales. Its assets are integrated with the Partnership's intrastate transportation and storage assets.

---

[5]     *Id.*

37.     The Partnership's Liquids Transportation and Services segment owns interest in approximately 2,000 miles of natural gas liquids pipelines, approximately three natural gas liquids processing plants, approximately four natural gas liquids and propane fractionation facilities, and natural gas liquids storage facilities.   The Liquids Transportation and Services segment includes processing and fractionating refinery off-gas.   The assets in the liquids transportation and services segment include infrastructure in the southern United States.

38.     SXL[6] owns and operates a logistics business that transports, terminals and stores crude oil, refined products and natural gas liquids.   SXL operates through three business segments including: (1) Crude Oil; (2) Natural Gas Liquids; and (3) Refined Products.   In addition to logistics services, it also owns acquisition and marketing assets, which facilitates the purchase and sale of crude oil, refined products and natural gas liquids.[7]

39.     The Retail Marketing segment is conducted through the Partnership's subsidiary, Sunoco, Inc.  Operations include the sales of motor fuel (gasoline and diesel) and merchandise at company-operated retail locations and branded convenience stores.   The segment also owns a membership interest in Sunoco, LLC, which distributes approximately 5.3 billion gallons per year of motor fuel to customers across the United States.   The segment, through Sunoco LP, operates over 850 convenience stores and retail fuel sites, and distributes motor fuel to convenience stores, independent dealers, commercial customers and distributors.

40.     The All Other segment operates through Sunoco, Inc. which owns approximately 33% non-operating interest in Philadelphia Energy Solutions ("PES"), a refining joint venture.

---

[6]     Considering ETP's investment in SXL prior to the merger of these two entities, SXL's operations are detailed as a segment for the purposes of this section.

[7]     In March 2016, ETP contributed to Sunoco LP its remaining 68.42% interest in Sunoco, LLC and 100% interest in the legacy Sunoco, Inc. retail business for $2.23 billion.  Sunoco LP paid $2.20 billion in cash, including a working capital adjustment, and issued 5.7 million Sunoco LP common units to ETP Retail Holdings, LLC, a wholly-owned subsidiary of the ETP.

The segment conducts marketing operations for the natural gas that flows through its gathering and intrastate transportation assets.  For both on-system and off-system gas, it purchases natural gas from natural gas producers and other suppliers and sell that natural gas to utilities, industrial consumers, other marketers and pipeline companies.  The Partnership owns all of the equity interests of a natural gas compression equipment business with operations in eight states.  It owns and operates a fleet of compressors used to provide natural gas compression services for customer specific systems.  The segment also has a fleet of equipment used to provide treating services, such as carbon dioxide and hydrogen sulfide removal, natural gas cooling, and dehydration.

**B.**     **The Flawed Process Leading to the Merger Agreement**

41.     As disclosed in the S-4, the Defendants have long sought to merge ETP with SXL and have discussed the same with executives from SXL.  Indeed, the organizational structure meant that the two parties could easily flout conflicts of interest to engage in negotiations with one another over many different types of transactions.

42.     The Proposed Transaction was flawed from the beginning as it is clear that once the Proposed Transaction was conceived, all other strategic alternatives were foreclosed.

43.     In early October 2016, and in preparation for their semi-annual meetings, management of ETE, ETP and SXL reviewed information related to current and projected financial performance, including projected financial performance under various assumptions related to future crude oil, natural gas and natural gas liquids prices, expected timing for completion of capital expenditure projects, projected debt levels and leverage ratios and other matters.  Based on this information, management of ETE analyzed various options to improve the distribution coverage ratios and leverage ratios at ETP and SXL under various assumptions

related to future financial performance, including the possibility of a merger of ETP and SXL. S-4, 49.

44. On October 19, 2016, the Board, ETE management, and the board of directors of LE GP, LLC, the general partner of ETE (the ETE Board) met informally regarding the possibility of a merger between ETP and SXL. The discussions continued through October 2016. *Id.*

45. On November 1, 2016, a joint meeting between the Board and ETE's Board was held to discuss the purported structure of any possible deals. At this meeting it was determined, given the interwoven nature of the management structure, that a "Conflicts Committees" would be consulted. *Id.*

46. That same day, formal resolutions, naming Defendants Skidmore and Grimm to serve on the ETP Conflicts Committee were adopted. However, those resolutions were not passed until November 14, 2016, just days before the Merger Agreement was announced. S-4, 50.[8]

47. Over the first week of November, Barclays was engaged as financial advisor and ETP furnished Barclays with the Partnership's financial model for the purposes of analysis. S-4, 50-51.

48. Defendant Warren, acting simultaneously in his executive capacity for ETE and ETP, sent a letter to the SXL board of directors soliciting their interest in the Proposed

---

[8] Indeed, the formation of the Conflicts Committee appears to have been purely for show as the S-4 provides "The ETP Conflicts Committee was not authorized to, and did not, conduct an auction process or other solicitation of interest from third parties for the acquisition of ETP. Given ETE's control over ETP's general partner, it was unrealistic to expect or pursue an unsolicited third party acquisition proposal or offer for the assets or control of ETP, and it was unlikely that the ETP Conflicts Committee could conduct a meaningful auction for the acquisition of the assets or control of ETP." S-4, 63.

Transaction.   The decision to enter into an all unit acquisition was agreed on or around November 11, 2016.  S-4, 52.

49.     On November 14, 2016, the Board, SXL, ETE, ETP Conflicts Committee, SXL standing Conflicts Committee, as well as their respective financial advisors and attorneys attended a meeting at which Defendant Ramsey provided a presentation to the group regarding ETP's business and operations, including a review of each of ETP's business segments and future expected growth projects.  *Id*.

50.     After Defendant Ramsey's presentation, the same group heard SXL executives give a presentation to the group regarding SXL's business and operations.  *Id*.

51.     From November 14 to November 16, 2016, Barclays met with SXL's financial advisors to discuss and consider the proposed transaction, including discussions regarding the potential benefits, legal and financial matters, and terms of the Proposed Transaction.  There was no discussion regarding alternative transactions.  S-4, 53.

52.     On November 18, 2016, SXL submitted a proposal to acquire ETP, pursuant to which ETP common unitholders would receive 1.475 SXL common units for each ETP common unit.  The next day, ETP submitted a counterproposal, and the ultimate Merger Consideration, whereby ETP common unitholders would receive only 1.50 SXL common units for each ETP common unit.  S-4, 55-56.

53.     From November 22, 2016 to December 8, 2016, ETP and SXL allegedly had various discussions regarding alternative structures for the Proposed Transaction.  However, the S-4 fails to disclose the basis for discussing such alternative transaction structures or their purported form. S-4, 58.   The single exchange described above was the totality of the negotiations disclosed in the S-4.

C.    **The Proposed Transaction**

54.    On November 20, 2016, ETP and SXL issued a press release announcing the

Proposed Transaction, which states in pertinent part:

> NEWTOWN SQUARE, PA AND DALLAS, TX  (November 21, 2016) – SXL Logistics
> Partners L.P. (NYSE: SXL) and Energy Transfer Partners, L.P. (NYSE: ETP) today
> announced that they have entered into a merger agreement providing for the acquisition
> of ETP by SXL in a unit-for-unit transaction. The transaction was approved by the boards
> of directors and conflicts committees of both partnerships and is expected to close in the
> first quarter of 2017, subject to receipt of ETP unitholder approval and other customary
> closing conditions.
>
> Under the terms of the transaction, ETP unitholders will receive 1.5 common units of
> SXL for each common unit of ETP they own. This equates to a 10% premium to the
> volume weighted average pricing of ETP's common units for the last 30 trading days
> immediately prior to the announcement of the transaction.
>
> As SXL will be the acquiring entity, the existing incentive distribution rights provisions
> in the SXL partnership agreement will continue to be in effect, and Energy Transfer
> Equity, L.P. (NYSE: ETE) will own the incentive distribution rights of SXL following
> the closing of the transaction. As part of this transaction, ETE has agreed to continue to
> provide all the incentive distribution right subsidies that are currently in effect with
> respect to both partnerships.
>
> The transaction is expected to be immediately accretive to SXL's distributable cash flow
> per common unit and is also expected to allow the combined partnership to be in position
> to achieve near-term distribution increases in the low double digits and a more than 1.0x
> distribution coverage ratio. The transaction is expected to provide significant benefits for
> SXL and ETP unitholders as the combined partnership will have increased scale and
> diversification across multiple producing basins and will have greater opportunities to
> more closely integrate SXL's natural gas liquids business with ETP's natural gas
> gathering, processing and transportation business. With this transaction, SXL and ETP
> expect to build upon their experience working together as partners in several joint
> ventures to pursue commercial opportunities and to achieve cost savings while enhancing
> the service capabilities for their customers. SXL and ETP expect that the transaction will
> allow for commercial synergies and costs savings in excess of $200 million annually by
> 2019.
>
> The transaction is also expected to strengthen the balance sheet of the combined
> organization by utilizing cash distribution savings to reduce debt and to fund a portion of
> the growth capital expenditure programs of the two partnerships. ETP and SXL have
> spent approximately $15 billion in organic growth capital over the past several years, and
> these expenditures, combined with the completion of other major capital projects
> currently in progress, are expected to continue to generate strong distributable cash flow
> growth.

Both ETP and SXL management teams are pleased to be able to bring two strong partnerships together in this strategic transaction that combines the premier crude oil midstream MLP with the premier natural gas midstream MLP. The combined partnership is expected to be the second largest MLP as measured by enterprise value.

At the closing of the transaction, the Chief Executive Officer, Chief Commercial Officer, President and Chief Financial Officer of the combined partnership will be Kelcy Warren, Mackie McCrea, Matt Ramsey and Tom Long, respectively, and it is expected that Mike Hennigan and other members of the SXL management team will continue in leading management roles of the combined company with the SXL business headquartered in Philadelphia.[9]

**D.**    **The Proposed Transaction Undervalues ETP's Units**

55.    As noted above, pursuant to the terms of the Merger Agreement, ETP unitholders will receive only 1.5 units of SXL common units for each unit of ETP that they own, which, based on the closing price of ETP common unit on November 18, 2016, the last trading day before the Merger Agreement was announced, implies a per unit Merger Consideration of only $39.29.  This consideration is inadequate and undervalues the Partnership.

56.    The Merger Consideration reflects an insufficient premium of approximately 5% to the volume-weighted average closing price of ETP common units for the five trading days ended November 18, 2016.  The Merger Consideration does not adequately compensate ETP unitholders for their loss of control.

57.    According to industry commentator Rida Morwa, "the deal favors SXL shareholders and puts ETP shareholders at a disadvantage."  He goes on to state that ETP unitholders do not receive a premium based on the closing prices of the prior day.  Additionally, the deal further disadvantages unitholders as it will see their dividends slashed by about 30%.[10]

---

[9]    www.sec.gov/Archives/edgar/data/1012569/000101256916000224/ex991pressreleasedated nove.htm.

[10]    http://seekingalpha.com/article/4025308-SXL-logistics-partners-advantage-merger-energy-transfer-partners.

58.     Likewise, a November 21, 2016 Forbes article titled "Is There Value In Sunoco Logistics' Merger With Energy Transfer Partners?" agrees that the merger should be met with investor skepticism.  Reporter Claire Poole writes that the merger consideration "looks cheap, valuing ETP at $39.29 per unit, slightly lower than its $39.37 closing price this past Friday (the entities say the price represents a 10% premium over the target's average closing price over the last 30 days)".[11]

59.     These positive outlooks are reflective of ETP's successful operations in 2016. For the quarter ending March 31, 2016, ETP reported adjusted Distributable Cash Flow of $349 million, compared to $321 million for the three months ended March 31, 2015, an increase of $28 million.  Adjusted EBIIDA for the first quarter 2016 totaled $1.41 billion, an increase of $46 million compared to the first quarter 2015.

60.     ETP announced a quarterly distribution to unitholders of $1.055 per common unit for the quarter ended June 30, 2016.  On August 2, 2016, the Partnership announced the successful completion of the project level financing of the Dakota Access Pipeline ("DAPL") and Entergy Transfer Crude Oil Pipeline ("ETCOP") projects (together, the "Bakken Pipeline"). The Bakken Pipeline is a $2.5 billion facility and according to ETP "is anticipated to provide substantially all of the remaining capital necessary to complete the projects."[12]

61.     ETP again reported positive financial results for the quarter ending June 30, 2016, reporting including the plan to sell a stake in its joint venture with SXL in the Bakken Pipeline to MarEn Bakken Company, LLC, for $2.00 billion in cash, $1.2 billion of which will go to ETP and SXL.

---

[11]     http://www.forbes.com/sites/clairepoole/2016/11/21/is-there-value-in-sunoco-logistics-merger-with-energy-transfer-partners/#505131ee443e.

[12]     http://ir.energytransfer.com/phoenix.zhtml?c=106094&p=irol-newsArticle_Print&ID=2192121.

62.     On November 9, 2016 ETP reported positive third quarter financial results, including the following: (i) in October 2016, ETE announced a $0.285 distribution per ETE common units for the quarter ended September 30, 2016, or $1.14 per unit on an annualized basis; and (ii) as of September 30, 2016, ETE's $1.5 billion revolving credit facility had $885 million of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 3.08x.

**E.      The Proposed Transaction Is the Result of a Conflicted Process.**

63.     The ownership interests involving ETP and SXL are overlapping and present conflicts.  ETE has economic interests that differ from those of ETP's unitholders due to its ownership of the general partner and incentive distribution rights in SXL.  ETE controls ETP through its ownership of ETP GP.  ETE also owns all of the limited partner interests of ETP GP, which owns the general partner interest and incentive distribution rights in ETP as well as the Class J units in ETP.  ETE owns the Class H units and Class I units in ETP, as well as approximately 0.5% of the outstanding ETP common units. In addition, ETE indirectly owns a 0.1% membership interest in SXL GP, which owns 100% of the general partner interest and incentive distribution rights in SXL.  ETP also owns rights in SXL through ownership in the SXL general partner.  ETE, the master limited partnership, owns the general partner and the incentive distribution rights of ETP and Sunoco, LP, and holds ownership interests in the common units of ETP.

64.     Several of the Board members are conflicted due to their board seats on other Energy Partner entities, e.g., Warren, Ramsey and McCrae (described above).  The Board's conflicts also arise due to their continued economic benefits they will receive as a result of the Proposed Transaction.  Importantly, after the consummation of the Proposed Transaction, Warren will become CEO of SXL, Ramsey will become the President of SXL, McCrea will

become Chief Commercial Officer of SXL, and Thomas E. Long, Chief Financial Officer of ETP, will become the Chief Financial Officer of SXL.  Additionally, the Individual Defendants will continue to serve as members of the ETP Board post-closing.

65.    Moreover, ETP officers and Individual Defendants will receive additional financial benefits through equity payouts.  For example, each ETP restricted unit held by ETP's directors and executive officers that is outstanding as of the consummation of the Merger will accelerate and convert into the right to receive an award of SXL restricted units on the same terms and conditions (the number of SXL common units will be equal to the number of ETP common units covered by the corresponding award of ETP restricted units multiplied by the exchange ratio, rounded up to the nearest whole unit).

66.    Despite these conflicts, the S-4 fails to disclose the timing, content and nature of all communications regarding future employment and directorship of ETP's officers and Individual Defendants, including who participated in any such communications.

**F.    The Merger Agreement Contains Onerous Deal Protection Devices.**

67.    Defendants agreed to sell the Partnership to SXL without engaging in any market check and agreed to onerous deal provisions and other agreements to ensure a sale only to SXL. These onerous and preclusive deal protection devices operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Partnership.

68.    The Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize unitholder value, including soliciting alternative acquisition proposals or business combinations.

69.    Specifically, Section 5.3(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Partnership personnel from soliciting, initiating, facilitating

or encouraging alternative proposals in an attempt to procure a price in excess of the amount offered by SXL.  The Partnership also must terminate any and all prior or existing discussions with other potential suitors.  *Id.*

70.     Additionally, Sections 5.3(c) and 5.3(d) of the Merger Agreement grants SXL recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) a notice period[13] to negotiate with ETP, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received. Section 5.3(c) requires the Partnership to notify SXL within 24 hours that it has received an inquiry, proposal or offer.  To further suppress any efforts by potential bidders to even reach out to the Partnership, Section 5.3(a) prohibits the Partnership from releasing any third parties from any existing standstill and/or confidentiality commitments.

71.     To further ensure the success of the Proposed Transaction, the Board locked up the deal by agreeing to pay a termination fee of $630 million.  Section 7.3(a).  The terms of the Merger Agreement essentially requires that the alternative bidder agree to pay a naked premium for the right to provide ETP's unitholders with a superior offer.

72.     The terms of the Merger Agreement essentially requires that the alternative bidder agree to pay a naked premium for the right to provide ETP's unitholders with a superior offer. These devices cumulatively discourage other potential bidders from making a competing bid for the Partnership, and prevent individual unitholders from exercising their rights to obtain a fair price for the Partnership units.

---

[13]     The period commences on the date of delivery of notice of a superior proposal and ends at 11:59 p.m. Central time on the date that is the fifth calendar day following the date of such delivery.

**G.**     **The Incomplete and Materially Misleading S-4**

73.     On December 19, 2016, SXL filed the S-4 with the SEC in connection with the Proposed Transaction.  The S-4 contains the proposed proxy statement for ETP's unitholder with Board's recommendation and solicitation of the Partnership's unitholders to vote in favor of the Proposed Transaction and is signed by one or more of the Director Defendants.

74.     The S-4 misrepresents and/or omits material information that is necessary for the Partnership's unitholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the S-4 fails to provide the Partnership's unitholders with material information concerning the process leading up to the consummation of the Proposed Transaction and information concerning the financial analysis and work performed by Barclays.  As a result of the incomplete and misleading S-4, the Partnership's unitholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**Materially Incomplete and Misleading Information Concerning the Background of the Proposed Transaction**

75.     The S-4 fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.  In particular, the *Background of the Merger* section contained on pages 49-58 of the S-4 is materially deficient in that it fails to disclose the following information:

- Whether any unsolicited strategic or other proposals and/or inquiries were made to ETP and, if so, what action was taken in response;

- The rationale and process for selecting Barclays as financial advisor and whether and to what extent the Board and/or Conflict Committee considered Barclays' relationship with SXL prior to engaging Barclays; and

- The reasons that the Individual Defendants McCrea and Perry failed to attend the

Board meeting at which the Board approved the Proposed Transaction and whether either expressed any doubts and/or issues regarding Proposed Transaction.

76.     The omission of the above information renders statements in the S-4 sections "Background of the Merger" and "Recommendation of the ETP Board; Reasons for the Merger" false and/or materially misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special unitholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to exchange their units and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

**The Materially Incomplete and Misleading Information Concerning the ETP and SXL Financial Forecasts and the Summary of the Barclay's Fairness Opinion**

77.     The December 20, 2016 S-4 also omits certain material information concerning the fairness of the Proposed Transaction and Merger Consideration.  Without such information, ETP unitholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

78.     First, Defendants disclosed in the "Unaudited Financial Projections of ETP" (S-4, 77-78), that were expressly relied on by the Board to recommend the Proposed Transaction and solicit unitholders to vote in favor of the Proposed Transaction, that numerous material assumptions were made to develop the Projections, including the following:

- the EBITDA and maintenance capital expenditures from existing assets and business activities;

- organic growth opportunities, and the amounts and timing of related capital expenditures and future EBITDA to be generated from such organic growth opportunities;

- the credit risk of customers and the potential impact from future deteriorations of credit quality, including the potential for bankruptcy, of certain customers and the financial impact to ETP related thereto;

- outstanding debt and debt and equity issuance during applicable periods, and the availability and cost of debt and equity capital;

- the amount and timing of debt repayments;

- the amount of incentive distribution subsidies that ETE provides to ETP; and

- other general business, market, and financial assumptions.

79.     However, these assumptions are not disclosed for unitholders to assess the manner and degree to which they impacted the creation of the Projections, and the failure to disclose these assumptions for unitholders to consider renders the Projections materially misleading.

80.     Additionally, it is unclear from the S-4 whether these ETP Projections were updated from projections previously presented for review by the Board on November 14, 2016, and if so, in what manner.  This information is material for ETP unitholders to weigh the Board's recommendation to vote in favor of the Proposed Transaction.

81.     The S-4 reflects several ETP projected metrics including Consolidated EBITDA, EBITDA, Distributable Cash Flow, Distributable Cash Flow per ETP common unit, Distributions per ETP common unit, and Distribution coverage ratio. S-4, 80.   The S-4 recognizes that these financial metrics are non-GAAP compliant financial measures and "should not be considered in isolation from, or as a substitute for, financial information presented in accordance with GAAP.  ETP's calculation of these non-GAAP measures may differ from others in its industry and is not necessarily comparable with similar titles used by other companies." *Id.* However, while these financial metrics are defined in the S-4, the individual inputs and assumptions made to create these non-GAAP financial measures are not disclosed.  Importantly,

the corresponding GAAP equivalent financial metrics and/or inputs are not disclosed including net income, revenue, unit-based compensation, the number of diluted units outstanding, "cash available to pay a unit's distribution expense", and expenses.

82.    Similarly, the S-4 discloses several Sunoco projected metrics including EBITDA, Distributable Cash Flow, Distributable Cash Flow per Sunoco common unit, and Distributions per Sunoco common unit ("Sunoco Projections") (S-4, 83), and the assumptions underlying the creation of those Sunoco Projections.

83.    Similar to the ETP Projections, the assumptions underlying the Sunoco Projections are not disclosed and include the following:

- the EBITDA and maintenance capital expenditures from existing assets and business activities;

- assumptions with respect to organic growth projects, including the timing of permitting, construction and start-up, and the amounts and timing of capital expenditures and EBITDA associated with such projects;

- the amount and timing of issuances of debt and equity securities, and the availability and cost of debt and equity capital;

- assumptions relating to the prices and production of, and demand for, crude oil, natural gas, NGLs, and other hydrocarbon and petrochemical products, and the commodities markets;

- the volumes of products handled and the margins associated with services and products provided to customers; and

- other general business, market, and financial assumptions.

84.    The S-4 recognizes that these Sunoco projected financial metrics are non-GAAP compliant financial measures and "should not be considered in isolation from, or as a substitute

for, financial information presented in accordance with GAAP. The calculation of these non-GAAP measures may differ from others in its industry and is not necessarily comparable with similar titles used by other companies." *Id.* However, while these financial metrics are defined in the S-4, the individual inputs and assumptions made to create these non-GAAP financial measures are not disclosed. Importantly, the corresponding GAAP equivalent financial metrics are not disclosed.

85.     The above financial projections for ETP and Sunoco were relied on by the Board to recommend the Proposed Transaction and solicit unitholder votes (S-4, 60), and utilized by the Partnership's financial advisor, Barclays, to render its Fairness Opinion to the Conflicts Committee. S-4, 64-65.

86.     The SEC requires the disclosure of certain information in solicitation materials. Thus, when a company discloses material information in an S-4 that includes non-GAAP financial measures, the company must also disclose that non-GAAP financial measure along with comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

87.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The former SEC Chair, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as ETP has included in the S-4 here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued

guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[14]

88.    In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections.[15]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.  The above-referenced line item projections that have been omitted from the S-4 are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to unitholders.

89.    The S-4 also discloses that Barclays reviewed the following information in creating certain valuations used to render its fairness opinion: (i) "financial and operating

---

[14]    *See* Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability (June 27, 2016), www.sec.gov/news/speech/chair-white-icgn-speech.html#_ftnref38 (emphasis added) (footnotes omitted).

[15]    *See, e.g*., Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

information with respect to the businesses, operations and prospects of ETP furnished to Barclays by ETP, including the ETP Unaudited Financial Projections (as defined in the section entitled "Unaudited Financial Projections of ETP") (the "ETP Projections"); (ii) ETP Management Written Statement (as more fully described in the section entitled "Unaudited Financial Projections of ETP"); (iii) financial and operating information with respect to the business, operations and prospects of SXL, initially prepared by management of SXL and furnished by SXL to the management of ETP (the "SXL Projections" and, together with the ETP Projections, the "Projections"); (iv) schedule of the incentive distribution subsidies provided by, and projected to be provided by, ETE to each of ETP and SXL and the expectation that following completion of the proposed transaction ETE will maintain such incentive distribution subsidies at the projected levels (the "IDR Projected Subsidies"); (v) comparison of the historical financial results and present financial condition of each of ETP and SXL with those of other companies that Barclays deemed relevant; (vi) comparison of the financial terms of the proposed transaction with the financial terms of certain other transactions that Barclays deemed relevant; and (vii) certain estimates provided by ETP to Barclays as to the amounts and timing of the cost savings and revenue enhancements (collectively, the "Expected Synergies") anticipated by the management of ETP to result from the proposed transaction.  S-4 at 65-66.

90.    However, as alleged above, critical material information, and information required to be disclosed by Regulation G, regarding ETP and Sunoco was not disclosed in the S-4, rendering the summary of Barclay's Fairness Opinion, which was approved and adopted by Defendants, misleading.

91.    In rendering its Fairness Opinion and applying the various valuation methodologies, Barclays made certain assumptions, in consultation with ETP and Sunoco management, with respect to industry performance, general business and economic conditions

and other matters, none of which were disclosed. S-4, 68. The failure to disclose these assumptions renders the summary of the Fairness Opinion and the results of the valuation methodologies, which relied on and incorporated the assumptions, misleading.

92.      Barclays' *Discounted Distributable Cash Flow Analysis* in the S-4 fails to disclose the following material information: (i) the manner in which distributable cash flows were calculated; (ii) the rationale and basis for two hypothetical reductions in ETP distributions; (iii) ETP's and Sunoco's projected cost of equity and underlying assumptions; (iv) the basis and rationale for utilizing different terminal yields for ETP based on projection scenarios and how such yields were allocated; (v) the implied perpetuity growth rates for ETP and Sunoco; (vi) the rationale for basing terminal yields on observed forward publicly traded peer yields for the years 2017 and 2018; (vii) the manner in which the discount rates were utilized including whether they applied to cash flows only or to estimated distributable cash flows and the terminal values; and (viii) the net present value used for ETP, and whether that metric was determined on a date other than January 1, 2017 (used for Sunoco).  S-4, 68-69.  The failure to disclose this information renders the summary of the *Discounted Distributable Cash Flow Analysis* misleading.

93.      Barclays' *Selected Comparable Company Analysis* in the S-4 fails to disclose the following material information: (i) the individual multiples for the selected comparable companies; (ii) the manner of calculating the reference equity value range of $37.00 to $45.00 per ETP common unit; and (iii) the manner of calculating the equity value reference range of $26.00 to $33.00 per Sunoco common unit.  S-4, 70-71.  The failure to disclose this information renders the summary of the *Selected Comparable Company Analysis* misleading.

94.      Barclays' *Selected Precedent Transactions Analysis* in the S-4 fails to disclose the following material information: (i) the individual multiples for the selected transactions; (ii) the rationale for the selection of the transactions used, including a transaction that is 20 years old,

which data is dated and likely skewed the analysis to be more favorable to the Fairness Opinion; (iii) the manner in which the equity value reference range for ETP of $34.00 to $41.00 per ETP common unit was calculated; and (iv) the manner in which equity value reference range for Sunoco of $17.00 to $24.50 per Sunoco common unit was calculated.  S-4, 72-73.  The failure to disclose this information renders the summary of the *Selected Precedent Transactions Analysis* misleading.

95.     With respect to the *Pro Forma Merger Consequences Analysis*, the S-4 fails to disclose the following material information: (i) the exchange ratio of Sunoco units per ETP unit based on the Status Quo Case; (ii) rationale for utilizing an exchange ratio different from the ratio from the Discounted Distributable Cash Flow Analysis; (iii) the discounted cash flow measures used by Barclays and the manner to calculate these measures including inputs and assumptions incorporated; and (iv) the projected value of the post-Merger partnership units, and relative contributions to such value by ETP and Sunoco.  S-4, 75-76.

## COUNT I

### Against ETP and the Director Defendants for
### Violations of Section 14(a) of the Securities Exchange Act of 1934

96.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

98.     During the relevant period, Defendants disseminated the false and misleading S-4 statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

99.     By virtue of their positions within the Partnership, the Director Defendants were aware of this information and of their duty to disclose this information in the S-4.  The S-4 was prepared, reviewed, and/or disseminated by the Director Defendants.  The S-4 misrepresented and/or omitted material facts, including material information about the unfair sale process for the Partnership, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Partnership's assets.  Defendants were at least negligent in filing the S-4 with these materially false and misleading statements and their failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

100.    The omissions and false and misleading statements in the S-4 are material in that a reasonable unitholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the S-4 and in other information reasonably available to unitholders.

101.    By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

102.    Unless Defendants are enjoined by the Court, they will continue to breach their duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

103.    Because of the false and misleading statements in the S-4, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.    Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

## COUNT II

**Against the Director Defendants**
**for Violations of Section 20(a) of the Securities Exchange Act of 1934**

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    The Director Defendants acted as controlling persons of the Partnership within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Partnership and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the false statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Partnership, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

106.    Each of the Director Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

107.    In particular, each of the Director Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, each of the Director Defendants is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The S-4 at issue contains the unanimous recommendation of each of the Director Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

108.    In addition, as the S-4 sets forth at length, and as described herein, the Director Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The S-4 purports to describe the various issues and information that they reviewed and considered — descriptions that had input from the Director Defendants.

109.    By virtue of the foregoing, the Director Defendants have violated Section 20(a) of the Exchange Act.

110.    Because of the false and misleading statements in the S-4, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure the Individual Defendants' misconduct is corrected.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with consummating, or closing the Proposed Transaction, unless and until the Partnership discloses the material information discussed above which has been omitted from the S-4;

C.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Directing Defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

E.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: January 25, 2017                              Respectfully submitted,


                                                     */s/James R. Banko*
                                                     James R. Banko (#4518)
                                                     Michael Van Gorder (#6214)
                                                     **FARUQI & FARUQI, LLP**
                                                     20 Montchanin Rd., Suite 145
                                                     Wilmington, DE 19807
                                                     Telephone: (302) 482-3182
                                                     Fax: (302) 482-3612

                                                     *Attorney for Plaintiff*


**OF COUNSEL**

**FARUQI & FARUQI, LLP**
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Ph. (212) 971-1341
Cell (305) 205-8284 or (646) 522-4840
email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*